**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NATIONWIDE MUTUAL INSURANCE | : | CIVIL ACTION |
| COMPANY, NATIONWIDE LIFE | : | |
| INSURANCE COMPANY | : | |
| | : | |
| v. | : | NO.  22-5001 |
| | : | |
| BERNADETTE MARIE HAGGERTY, | : | |
| MEGAN F. LENNON DUCA, KRISTIE A. | : | |
| LENNON POOLE, J.P., B.P., N.P., THOMAS | : | |
| J. LENNON, III, MATTHEW R. LENNON | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                                          **April 28, 2025**

      This is a convoluted family feud over who gets the death benefits of a deceased father,
Thomas J. Lennon, Jr.  On one side, there is Bernadette Haggerty, the former fiancé.  She is
named in Mr. Lennon's papers.  On the other side, Mr. Lennon's family, who claim that Ms.
Haggerty is a fraud.  According to the family, Ms. Haggerty tricked Mr. Lennon into supporting
her for years while she got engaged and married to another man behind his back.  Ms. Haggerty
says Mr. Lennon knew what was going on and chose her over his family anyway.

      Protracted litigation ensued, beginning with an interpleader from the insurance company.
The Lennons brought claims of fraud, conversion, and unjust enrichment to annul the
beneficiary designations and retake the benefits from Ms. Haggerty.  We are here now on Ms.
Haggerty's motion for summary judgment, which argues that the family's claims of fraud,
conversion, and unjust enrichment are barred by either Pennsylvania's Heart Balm Statute or the
statute of limitations — or fail simply for want of evidence.  As explained below, we deny Ms.
Haggerty's motion in its entirety.  The claims are not barred and the record evinces genuine
disputes of fact — particularly about whether Mr. Lennon knew that Ms. Haggerty had married

another man, whether Ms. Haggerty falsely led Mr. Lennon to believe they were still engaged, and whether she intended to conceal her marriage for her own benefit.

## I.    Background

Bernadette Marie Haggerty was engaged to Thomas J. Lennon, Jr. (Mr. Lennon) on Christmas Day, 2011.  DI 68-1 at 5.[1]  But they never wed.  Mr. Lennon died on June 16, 2022. *Id.* at 22.

Mr. Lennon held a life insurance policy with Nationwide (the policy).  *Id.* at 3.  On February 24, 2012, he designated Ms. Haggerty as the sole primary beneficiary and listed her as his "fiancé."  DI 1-5.  This was Mr. Lennon's final change to the policy.  Mr. Lennon, who was an insurance agent, was also entitled to deferred compensation benefits (the benefits) under an independent contractor agent agreement with Nationwide.  DI 61 ¶ 3; DI 68-1 at 3; DI 1 ¶¶ 29-30.  Lennon signed several multiple beneficiary designations assigning the benefits under the contractor agreement.  The most recent, dated June 27, 2019, designated Ms. Haggerty as his "fiancé," allocating 85 percent of the benefits to her, while granting 5 percent to each of his three grandsons.  DI 1 ¶ 35; DI 27 at 5, 18-19.

From around 2017 until his death, Mr. Lennon provided for Ms. Haggerty by depositing money into a joint bank account, paying for health, automobile, and dental insurance, as well as giving her a car and a cell phone.  DI 68-1 at 14; DI 61 ¶ 42; DI 61-14 at 159-74.

On December 20, 2019, Ms. Haggerty and Thomas Hickey obtained a marriage license, and on February 16, 2020, Ms. Haggerty married Mr. Hickey.  DI 61 ¶ 50; DI 68-1 at 17; *see* DI 61-12.

---

[1] We refer to ECF pages unless otherwise noted.

Following Mr. Lennon's death, Ms. Haggerty contacted Nationwide seeking information related to Mr. Lennon and was informed that all beneficiaries needed to complete claim forms. DI 61 ¶ 67; DI 68-1 at 22.  On July 18, 2022, Mr. Lennon's daughter Megan F. Lennon Duca, as Executrix of Mr. Lennon's estate, requested Nationwide disclose the beneficiaries and their respective benefit allocations.  DI 1 ¶ 43.  On July 25, 2022, Ms. Duca's attorney notified Nationwide that she had "reason to believe that the beneficiary designations may be ineffective to the extent anyone other than the children or grandchildren are named, due to mistake of fact or law, incapacity, undue influence, fraud, or duress."  DI 1-17.  Ms. Haggerty submitted her own claim under the policy on October 20, 2022.  DI 1-20.

In response to Ms. Duca's attorney's request to withhold distribution of any benefits, Nationwide stated that it would review all relevant contracts before disbursing funds.  DI 1-21. On December 15, 2022, Nationwide initiated this interpleader action against Ms. Haggerty and the Lennon family members, including Ms. Duca, the Estate of Thomas J. Lennon, Jr., Kristie A. Lennon Poole, J.P., a minor, B.P., a minor, N.P., a minor, Thomas J. Lennon III, and Matthew R. Lennon (collectively, the Lennon defendants).  Nationwide seeks to resolve the competing claims over the benefits.  *See* DI 1.

On May 19, 2023, the Lennon defendants filed crossclaims against Ms. Haggerty, seeking declaratory relief that she was not entitled to any benefits and requesting rescission of the beneficiary designations.  *See* DI 27.  They also alleged fraud, constructive fraud, conversion of a joint bank account, conversion of an engagement ring, and unjust enrichment, contending that Ms. Haggerty misled Mr. Lennon into believing they were still engaged despite her marriage to Mr. Hickey.  *See id.*

3

Ms. Haggerty filed a motion to dismiss, which we denied.  DI 31; DI 44.  Discovery followed and is now complete.  On December 23, 2024, Ms. Haggerty moved for summary judgment.  DI 60; DI 62.  Ms. Haggerty argues that the Heart Balm Statute bars the Lennon defendants' crossclaims except for those related to the engagement ring.  DI 62 at 12 (brief page) (citing 23 Pa. Cons. Stat. Ann. § 1902, known as Pennsylvania's Heart Balm Statute).  Ms. Haggerty also argues that even if the crossclaims are not barred by the Heart Balm Statute, the Lennon defendants cannot prove justifiable reliance, scienter, or the existence of a material misrepresentation, which are elements of the fraud-based crossclaims — I though IV and VII.  *Id.* at 14-22 (brief pages).  Finally, Haggerty argues that the conversion counterclaims — V and VI — are barred by the statute of limitations.  *Id.* at 22-24 (brief pages).  This motion is now fully briefed.  We address each argument in turn below.

## II.    Analysis

A movant is entitled summary judgment if it demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party moving for summary judgment based on the absence of a dispute of material fact "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant portions of the record.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If that showing is made, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  "The non-movant is entitled to all reasonable inferences in its favor."  *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990).  "Rest[ing] on the mere allegations" in the pleadings is insufficient.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). The non-moving party need not "produce evidence in a form that would be admissible at trial," but it must present specific facts that "are capable of proof through admissible evidence." *J.F. Feeser*, 909 F.2d at 1542. "'[D]iscredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion.' Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989) (quoting *Liberty Lobby*, 477 U.S. at 256-57). However, "[c]ases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment." *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999).

### A. Heart Balm Statute

Pennsylvania's Heart Balm Act provides that "[a]ll causes of action for breach of contract to marry are abolished." 23 Pa. Cons. Stat. § 1902 (2021). The Pennsylvania Supreme Court first considered the statute in *Pavlicic*, where the plaintiff, over twice the defendant's age, sued to recover gifts presented in anticipation of marriage when the defendant disappeared with the plaintiff's money and married a younger man. *Pavlicic v. Vogtsberger*, 136 A.2d 127, 128-29 (Pa. 1957). The court colorfully explained that:

> [t]o allow [the defendant] to retain the money and property which she got from [the plaintiff] by dangling before him the grapes of matrimony which she never intended to let him pluck would be to place a premium on trickery, cunning, and duplicitous dealing. It would be to make a mockery of the law enacted by the Legislature in that very field of happy and unhappy hunting.

*Id.* at 130. The court made clear that conditional gifts, even if resulting from a breach of contract to marry, are actionable, stating that "[t]he abolition is confined to actions for breach of contract to marry, that is, the actual fracture of the wedding contract." *Id.* at 131-32.

In *Lampus v. Lampus*, the Pennsylvania Supreme Court addressed a claim for "breach of promise to marry arising out of the failure of an individual to disclose that he lacked the legal capacity to marry . . . ." *Lampus v. Lampus*, 660 A.2d 1308, 1309 (Pa. 1995). There, the plaintiff sued her husband for failing to disclose that he had never legally divorced his prior wife. *Id.* The court explained that the "Heart Balm Act was enacted to eliminate the potential for fraudulent and overblown claims arising from a broken engagement." *Id.* at 1310. Thus, although "[t]he decision not to marry is not actionable . . . the Act does not extend protection to an individual who deceitfully uses the promise to marry to deprive another of his property." *Id*. The court barred any action related to events *before* the fraudulent marriage and allowed recovery for everything *after*. *Id.* at 1311.

Here, Ms. Haggerty admits that the Heart Balm Statute would not bar recovery of the engagement ring as that is a conditional gift. DI 60-1 at 19. Thus, our analysis concerns the claims only as they relate to the policy and the benefits. The Lennon defendants argue that their claims are for fraud and not for breach of a contract to marry. DI 68 at 28. They contend that Ms. Haggerty received compensation from the policy and the benefits only because she misled Mr. Lennon into believing that she was going to marry him. And because Ms. Haggerty was already married to Mr. Hickey and could not legally marry Mr. Lennon, the Heart Balm statute does not bar their claims.

We agree with the Lennon defendants and conclude that their crossclaims are not barred by the Heart Balm Statute. Contrary to Ms. Haggerty's characterization, the crux of the Lennon defendants' claims is not simply that Ms. Haggerty failed to hold up her end of the bargain by "deci[ding] not to marry" Mr. Lennon. *See Lampus*, 660 A.2d at 1310. Rather, their claims are

that Ms. Haggerty concealed that she could not legally marry Mr. Lennon because she was already married to Mr. Hickey, "deceitfully us[ing] the promise to marry to deprive [Mr. Lennon] of his property." *Id.*; *see* DI 68 at 14, 28.  The Lennon defendants' claims survive the Heart Balm Statute because they assert that Ms. Haggerty went beyond merely breaking off an engagement to profiting by knowingly concealing a separate marriage.

### B.   Fraud

The Lennon defendants allege that Ms. Haggerty committed fraud by misrepresenting her willingness and ability to become engaged to Mr. Lennon after marrying Mr. Hickey, and that Mr. Lennon relied on those misrepresentations in retaining her as a beneficiary and continuing his financial support.  DI 68 at 9-20.

To establish a claim for fraud, a plaintiff must prove by clear and convincing evidence that (1) the defendant made a representation; (2) the representation was material; (3) the representation was made with knowledge of its falsity or recklessness as to whether it is true or false; (4) the representation was made with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the reliance proximately caused the resulting injury.  *Rosemont Taxicab Co. v. Phila. Parking Auth.*, 327 F. Supp. 3d 803, 829-30 (E.D. Pa. 2018); *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994).  "A fraud consists [of] anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture."  *Frowen v. Blank*, 493 Pa. 137, 143 (1981).

Ms. Haggerty argues that the Lennon defendants cannot prove justifiable reliance because she told Mr. Lennon about her engagement to Mr. Hickey, after which Mr. Lennon did

not remove her from any beneficiary policies.  DI 62 at 20-21.  Similarly, she argues that the Lennon defendants cannot prove scienter because Ms. Haggerty had no knowledge of her beneficiary designation and because she had told Mr. Lennon about her engagement with Mr. Hickey.  DI 62 at 23-25.  Lastly, Ms. Haggerty argues the Lennon defendants cannot prove materiality because she did not make material representations of fact and that she ended her engagement with Mr. Lennon.  DI 62 at 26.  We address these arguments in turn.

### i.  *Justifiable reliance*

The Lennon defendants identified record evidence sufficient to support a finding of justifiable reliance.  Under their theory, the key question is whether Mr. Lennon justifiably relied on Ms. Haggerty's representations that she planned to marry Mr. Lennon when deciding to keep her as a beneficiary and to continue providing financial support after she became engaged to Mr. Hickey.  Ms. Haggerty argues that it is undisputed that the record shows that she affirmatively ended her engagement to Lennon and told him that she had married Mr. Hickey, and therefore Mr. Lennon could not have justifiably relied on any alleged representations by her of intent to marry him when Mr. Lennon made his decision to maintain her beneficiary status.  DI 62 at 20-23.  However, the Lennon defendants effectively challenge each piece of evidence that Ms. Haggerty cites as undisputed proof, thus precluding summary judgment.

First, Ms. Haggerty asserts that she affirmatively told Mr. Lennon that she was no longer engaged to him.  Ms. Haggerty argues that she ended her engagement with Mr. Lennon on October 27, 2019, following his alleged drinking at Ms. Duca's wedding the day before, by giving him a letter that reads: "I never want to lose you as my friend but I cannot deal with the 'bad habit' again in a relationship of engagement and marriage, . . . I will be your friend forever

8

and if you decide that you don't want to waste your time, I understand.  You deserve to be happy."  DI 61-19; DI 61 ¶¶ 38-39.   Ms. Haggerty also points to her own testimony that on or around that same day, she had a phone call with Mr. Lennon in which she told him she was going to marry someone else and reaffirmed the statements in the letter.  DI 61 ¶ 40.  Additionally, Ms. Haggerty argues that her communication with Mr. Lennon almost entirely stopped for a "year-plus period" following the letter and phone call and she stopped sending Mr. Lennon diamond ring emojis.  DI 62 at 21-23.

But in response, the Lennon defendants dispute the letter's authenticity, contending that it is undated, was never found among his papers, omits any reference to the prior day's wedding incident, and was produced only by Haggerty, and even dispute whether Mr. Lennon drank at Ms. Duca's wedding at all.  DI 68 at 23; DI 68-1 at 10-11.  The Lennon defendants do not dispute the existence of the phone call, but rather point to testimony indicating that Ms. Haggerty had not yet discussed the possibility of marriage with Mr. Hickey and therefore would not have told Mr. Lennon she intended to marry anyone else.  DI 68-1 at 10-12.  They further rely on testimony indicating that Mr. Lennon's children believed that Ms. Haggerty and Mr. Lennon remained engaged until his death and intended to move to Florida together.  *Id.*  The Lennon defendants also offer deposition testimony from Ms. Haggerty where she indicates that the two of them had prior breaks in their relationship.  DI 68 at 23-24.  They also point to text messages where Mr. Lennon asked Ms. Haggerty "where things are" only to receive loving replies, suggesting any gap in contact did not definitively end the engagement.  *Id.*; DI 68-1 at 19-20.  For at least those reasons, there is a genuine dispute over whether the Ms. Haggerty affirmatively broke off the engagement such that Mr. Lennon could not have justifiably relied on

any alleged subsequent representations by Ms. Haggerty regarding the engagement.

Ms. Haggerty next points to three purported communications that she argues indisputably demonstrate that she informed Mr. Lennon of her marriage to Mr. Hickey: a text message in January 2020, a phone call in August 2020 concerning her marital woes where she told Mr. Lennon she married "Tomaso" (Ms. Haggerty's pet name for Mr. Hickey), and a May 2022 invitation to join her and Mr. Hickey on vacation.  DI 61 at 10, 12-13.  Ms. Haggerty argues that Mr. Lennon was not justified in relying on any alleged misrepresentations that she intended to marry Mr. Lennon after receiving these communications.

The Lennon defendants argue that none of the above indisputably demonstrates that Ms. Haggerty told Mr. Lennon that she was married to Mr. Hickey.  DI 68-1 at 11-12, 16-17, 35. The Lennon defendants counter that no January 2020 text discloses Ms. Haggerty's marriage to Mr. Hickey; that in over 2,500 texts exchanged thereafter, Lennon still refers to Ms. Haggerty as his wife; that she never suggested Mr. Hickey would join them on a trip, and only mentioned a trip to Norfolk, Virginia to attend an aviation seminar; and that none of the messages mention "Tomaso."  DI 68 at 23-24; DI 68-1 at 16-17, 21.  These conflicting accounts give rise to a genuine factual dispute over whether Ms. Haggerty informed Mr. Lennon of her marriage to Mr. Hickey — and, consequently, whether Mr. Lennon was justified in relying on her later alleged misrepresentations about their engagement and marriage.

Resolution of the above factual disputes bear on the issue of justifiable reliance, and therefore, summary judgment is inappropriate.

    *ii.  Scienter*

The issue of scienter also resists summary judgment here.  First, Ms. Haggerty argues

that she had no knowledge of her beneficiary designation until after Mr. Lennon's death, which

defeats scienter.  However, "[s]cienter [is] the maker's knowledge of the untrue character of his

representation." *Kilbride Invs. Ltd. v. Cushman & Wakefield of Pa., Inc.*, No. 13-5195, 2018 WL

1960826, at *15 (E.D. Pa. Apr. 26, 2018) (quoting *Ira G. Steffy & Son, Inc. v. Citizens Bank of

Pa.*, 7 A.3d 278, 290 (Pa. Super. Ct. 2010)).  It is well-settled Pennsylvania law that "[f]raud is

proved when it is shown that the false representation was made knowingly, or in conscious

ignorance of the truth, or recklessly, without caring whether it be true or false." *Warren

Balderston Co. v. Integrity Tr. Co.*, 170 A. 282, 283 (Pa. 1934).  It is equally well-settled that

"[t]he deliberate nondisclosure of a material fact amounts to culpable misrepresentation no less

than does an intentional affirmation of a material falsity."  *Neuman v. Corn Exch. Nat. Bank &

Tr. Co.*, 51 A.2d 759, 764 (Pa. 1947); s*ee also Frowen v. Blank*, 425 A.2d 412, 415 (Pa. 1981).

The Lennon defendants point out that Ms. Haggerty's only income came from the joint bank

account that Mr. Lennon used; that her text messages are of the same tone as when she was

properly engaged to Mr. Lennon before marrying Mr. Hickey; and that she engaged in sexual

relations with Mr. Lennon after marrying Mr. Hickey.  DI 68 at 20-25.  A reasonable juror could

rely on this evidence to conclude that Ms. Haggerty was aware of "the untrue character" of her

actions.  *Ira G. Steffy & Son*, 7 A.3d at 290.  Therefore, summary judgment is inappropriate on

the element of scienter.[2]

---

[2] Within her scienter argument, Ms. Haggerty also argues that she had no knowledge of
her beneficiary designation until after Mr. Lennon's death.  DI 62 at 23-24.  However, the question of Ms. Haggerty's knowledge of the benefits is more
pertinent to proximate cause.  Scienter asks whether Ms. Haggerty intentionally misled Mr.
Lennon, not whether she knew exactly what benefits she would receive from any such
misrepresentation.  *See Ira G. Steffy & Son, Inc*, 7 A.3d at 290.  We address this proximate cause

### iii.  Material misrepresentation

Along the same lines, Ms. Haggerty also argues that the Lennon defendants cannot prove material misrepresentation because Mr. Lennon would have left her as a beneficiary even though he knew she was married to Mr. Hickey.  The Lennon defendants assert that a reasonable jury could disagree, relying on evidence from Mr. Lennon's ex-wife, Margeret, who explained that as soon as their divorce was imminent, he removed her from his life insurance policy.  DI 68 at 24; DI 68-3 at 63.  The Lennon defendants further point to evidence that Mr. Lennon updated his beneficiary every time a grandchild was born.  DI 68 at 25.  Therefore, they argue that he would have removed Ms. Haggerty had he known their engagement was truly over.  We agree that this is a reasonable inference drawn in the non-movant's favor that presents a genuine issue of fact better suited for a jury than a court to determine.  *J.F. Feeser*, 909 F.2d at 1531.

Considering all the evidence and granting all fair inferences to the non-movant, as we must, we conclude that a reasonable juror could find fraud here.  Thus, summary judgment is denied as to the fraud claim.

### C.  Conversion Claims

---

issue briefly.

The proximate cause doctrine "is only intended to prevent liability for unforeseeable or extraordinary consequences of one's actions."  *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 774 (3d Cir. 2009); *Woodward v. Dietrich*, 548 A.2d 301, 308-311 (Pa. Super. Ct. 1988) (citing Restatement (Second) of Torts § 531 (Am. L. Inst. 1977)).  In her deposition, Ms. Haggerty testified that Mr. Lennon told her in 2012 that she was a beneficiary of his life insurance policy. DI 61-14 at 228-31.  But she later testified that she did not know she was listed as a beneficiary of Lennon's death benefits.  *Id.*  Because the Lennon defendants have identified enough evidence for a reasonable jury to find that Ms. Haggerty knew that Mr. Lennon included her as a beneficiary under the life insurance policy because of their relationship, a jury could also find that it was foreseeable that Mr. Lennon could have added Ms. Haggerty as a beneficiary for other policies or benefits.  Thus, the element of proximate cause is also proper for jury consideration.

At the threshold, Ms. Haggerty argues that the Lennon defendants' conversion claims are time-barred.  DI 62 at 27.  Pennsylvania has a two-year statute of limitations for "an action for taking, detaining or injuring personal property, including actions for specific recovery thereof." 42 Pa. Cons. Stat. § 5524 (2024).  However, "[t]he law is clear that fraud or deceit tolls the statute of limitations until such time as the fraud has been discovered by the exercise of due diligence." *Rothman v. Fillette*, 469 A.2d 543, 546 n.3 (Pa. 1983) (citing *Holmberg v. Armbrecht*, 327 U.S. 392 (1946), and then *Nesbitt v. Erie Coach Co.*, 204 A.2d 473 (Pa. 1964)). The Lennon defendants first learned that Ms. Haggerty was married to Mr. Hickey after Mr. Lennon's death and after hiring a private investigator in October 2022.  DI 61-26 at 129-31; DI 61-23 at 91.  Applying the discovery rule here, the bar of the statute of limitations on the fraud claims did not begin to run until October 2022.  Thus, the Lennon defendants' conversion claim is timely.

Turning to the merits, the Lennon defendants bring a claim of conversion related to the joint bank account between Ms. Haggerty and Mr. Lennon.  From 2017 until his death, Mr. Lennon made deposits into a joint bank account he owned with Ms. Haggerty.  DI 68-1 at 14. Ms. Haggerty admits that the withdrawals she made from this account were her only source of income.  DI 68-1 at 14; DI 61 ¶ 42; DI 61-14 at 159-74.  "The Pennsylvania courts define conversion as the deprivation of another's right of property in, or use or possession of, a chattel without the owner's consent and without legal justification."  *Welded Tube Co. of Am. v. Phoenix Steel Corp.*, 512 F.2d 342, 345 (3d Cir. 1975) (citing *Stevenson v. Econ. Bank of Ambridge*, 197 A.2d 721 (Pa. 1964)).

The Lennon defendants argue that Mr. Lennon consented to Ms. Haggerty's withdrawal

from the joint bank account only because he was misled by Ms. Haggerty's concealment of her marriage to Mr. Hickey. DI 68 at 30-31. The Lennon defendants do not seek recovery of any deposits made before Ms. Haggerty's engagement to Mr. Hickey but rather only for the deposits made afterward. *Id.*; *see Lampus*, 660 A.2d at 1310. The Lennon defendants do not dispute that Mr. Lennon consented to Ms. Haggerty's withdrawal of the joint account deposits. Instead, they argue that Mr. Lennon would have withdrawn this consent had he known that Ms. Haggerty married Mr. Hickey. Thus, the conversion claim requires proof of fraud. Having decided that the fraud claim warrants jury consideration, summary judgment is likewise denied with respect to the claim for conversion of joint bank account deposits.

The Lennon defendants also bring a claim of conversion related to an engagement ring that Mr. Lennon gave to Ms. Haggerty. Pennsylvania courts have long held that the "law treats the giving of an engagement ring as a conditional gift." *Lindh v. Surman*, 742 A.2d 643, 644 (Pa. 1999) (citing *Pavlicic*, 136 A.2d 127). In *Pavlicic*, Justice Musmanno explained that:

> A gift given by a man to a woman on condition that she embark on the sea of matrimony with him is no different from a gift based on the condition that the donee sail on any other sea. If, after receiving the provisional gift, the donee refuses to leave the harbor, — if the anchor of contractual performance sticks in the sands of irresolution and procrastination — the gift must be restored to the donor.

*Pavlicic*, 136 A.2d at 130.[3]

At first, Mr. Lennon proposed with a 3.21-carat diamond ring. DI 61-14 at 10, 187-89. In February 2012, he replaced this ring with a 5.04-carat diamond ring purchased for approximately $51,000. DI 61-14 at 189-92; DI 61-17. Mr. Lennon insured the new ring at an appraised value of $63,315. DI 68-2 at 106.

---

[3] Something about these sorts of cases inspires poetic judicial writing.

Ms. Haggerty claims that in 2014, she and Mr. Lennon discovered the diamond was lab-grown, sold it for $16,000, and replaced it with an imitation stone.  DI 61 ¶ 23.  The Lennon defendants dispute this, asserting that the ring was never sold because Mr. Lennon continued to insure the ring under his renter's insurance policy until he died.  DI 68-2 at 106.  They further claim that Ms. Haggerty wore the original ring to Ms. Duca's wedding in 2019 and that Mr. Lennon's children saw her wearing the ring during her visits to them.  DI 68-1 at 7 ¶ 23; DI 68-3 at 74 ¶ 23, 82 ¶ 29, 87 ¶ 21).

Ms. Haggerty argues that summary judgment should be granted on the conversion claim for the ring.  She contends that the Lennon defendants have nothing to recover because the original wedding ring was sold and the proceeds were split distributed to both between her and Mr. Lennon, and there is no "clear, precise and indubitable" evidence that the proceeds were a conditional gift.  DI 61 ¶ 23; DI 62 at 28-29.  But the Lennon defendants proffer contrary evidence for a reasonable jury to find that the ring was never sold, creating a genuine dispute over the fate of the engagement ring.  DI 68-2 at 106, 124.  As evidence that the ring was never sold or that Ms. Haggerty sold the ring herself and kept all the proceeds without Mr. Lennon's knowledge, they point to the fact that Mr. Lennon paid more in insurance premiums by continuing to insure the engagement ring than the supposed sale price Mr. Lennon received.  DI 68 at 30; DI 68-2 at 124.

Ms. Haggerty relies solely on her own testimony and unverified text messages to argue that the ring was sold and the proceeds were split evenly.  DI 61-4; 61-14 at 188-202.  The Lennon defendants dispute Ms. Haggerty's testimony, pointing out that there is no bank record of a deposit in the amount Ms. Haggerty claims.  DI 68 at 30.  Thus, the parties present a clear

15

factual dispute about whether the ring was sold or if Ms. Haggerty retained possession of the ring.  Because "[c]ases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment," the conversion claim of the engagement ring will be decided by a jury.  *Abraham*, 183 F.3d at 287.

III.    **Conclusion**

For the reasons explained above, Ms. Haggerty's motion for summary judgement is denied in its entirety.